## SALTUS AND OTHERS *against* THE OCEAN INSURANCE COMPANY.

THIS was an 'action on two policies of insurance, the one on the cargo, and the other on the freight of the ship *Nancy*, (both

ance on the ves-
r obliged in'o a
necessit,
carro, taken out, in order to repair the vessel, was found to be greatly deteriorated, and in a state not fit to be
od, and was, accordingly, sold; the vessel was repaired so as to be able to prosecute the voyage; the in-
...................... for a loss of the freight, as the subject, although damaged, still remained *in specie*.
Insurance on a *cargo* of flour and corn; a part of the cargo was thrown overboard for the preservation of the
ship and lading, in a storm, by which the residue was greatly deteriorated, and the vessel having put into a port of
necessity. was found to be unfit to be re-shipped, and was sold; it was held that the insured was entitled to contri-
bution for the corn thrown overboard, but that the insurer was protected by the *memorandum* from any loss on
what remained *in specie*, although it had been reduced, by sea damage, to less than half its value.

ship and cargo belonging to the plaintiffs,) on a voyage from *New-York* to *Lisbon*. The cause was tried at the *New-York* sittings, in *November*, 1815, before Mr. Justice *Spencer*.

The cargo of the vessel consisted entirely of rye-flour and *Indian* corn; the policy on the cargo was an open policy, underwritten by the defendants for the sum of 12,000 dollars, and containing the usual printed memorandum; that grain of all kinds, &c., and all articles perishable in their own nature, were warranted free from average, unless general. The policy on *freight* was a valued policy, and was underwritten for the sum of 10,000 dollars. The ship set sail on the voyage insured on the 23d of *April*, 1813, from the port of *New-York*, and put to sea on the 26th. On the 29th of *April* she encountered a very violent storm, which lasted several days, during which time the vessel laboured and strained very much. The next day, it was feared that some of the corn had been wet; and on the 2d of *May*, the storm having increased, the ship *healed* so much as to render the pumps useless, and was afterwards thrown upon her beam ends, and so remained for several minutes; and it was, upon a consultation between the captain, officers, and crew, thought necessary to cut away the mainmast and fore topmast, which was immediately done, and the ship righted; but in a few hours after came on her beam ends again, and so remained three or four days; the next day the tiller and rudder, with the rudder case, and the rudder braces at the bottom, were carried away, which caused the ship to leak badly, she at the same time *healing* so much that pumping was ineffectual. On the 4th of *May*, for the purpose of lightening the ship aft, and in order to raise the stern, where the leak appeared to be, for the purpose of stopping the leak, a large quantity of flour and corn were thrown overboard from the run and after-hatchway, by which means the leak was found, and principally stopped; but in consequence of this the ship was brought so much by the head, as essentially to injure her cargo by the quantity of water in the forehold. On the night of the same day, the larboard main channels, with the principal part of the bulwark, with some of the rails, were washed away, and part of the cargo was thrown overboard, out of the forehold, in order to lighten the ship forward. About the 6th of *May* the weather moderated, and jury masts were put up, and a steering oar made, and on the 18th the vessel arrived at *Newport*, in the state of *Rhode-Island*. A survey of the vessel was there held,

ALBANY,
Jannar., 1817.

SALTUS
v.
OCEAN INS. CO,
and all her cargo was discharged, in order to repair her, the greater part of which was materially injured, and some of it. had become putrid. The cargo was not in a state to bear transportation, and required great care, after being unloaded, to preserve it from further deterioration. The whole of it was sold at *Newport;* and on the 28th of *July,* the vessel was fully repaired, and in a state to proceed to sea, but did not, however, prosecute this or any other voyage.

A verdict was taken, by consent of the parties, for the plaintiff for 22,000 dollars, subject to the opinion of the court; and, in case of judgment for the plaintiffs, for either a total or partial loss, the amount was to be subsequently adjusted.

*Colden,* for the plaintiffs. 1. Here was a total, and not an average loss of the cargo, and the plaintiffs are entitled, therefore, to recover for a total loss, under the memorandum. The loss, both in quantity and value, is more than one half of the subject insured, so that there is, clearly, a technical total loss. But it will be said that is not sufficient; that there must be a *physical* total loss, or an absolute destruction of the thing, to entitle the plaintiff to recover for articles within the memorandum.

This doctrine originated with Lord *Mansfield,* in the case of *Cocking* v. *Fraser,\** and it was adopted by this court in *Le Roy* v. *Gouverneur,†* and in *M'Grath & Higgins* v. *Church.‡* If, however, it can be shown that the opinion of Lord *Mansfield* has been, subsequently, overruled by the courts in *England,* we venture to hope that this court may be induced to review its former decision. Lord *Mansfield* says, " if the commodity *specifically* remains, the underwriter is discharged." But if this is not, in principle, an *average* loss, it is difficult to discover any reason for a distinction between a physical and a technical total loss.

In *Burnet* v. *Kensington,§* Lord *Kenyon* says, " with regard to *Cocking and Fraser,* it is sufficient to say, that there was a stranding in that case. What was there said was, likewise, an *obiter dictum ;* and I cannot subscribe to the opinion there given, that ' *if the commodity specifically remain, the underwriter is discharged.' "* And in *Dyson and others* v. *Rowcroft,‖* Lord *Alvanley* said, that the case of *Cocking* v. *Fraser* was the only thing that raised a doubt in his mind; but the authority of that

* Marsh. on Ins.
227  Park, (6th
edit.,) 151.
† 1 Johns. Cas.
226. .
‡ 1 Caines' Rep.
213.

§ 7 Term Rep.
210.

‖ 3 Bos. & Pull.
474  Marsh. on
Ins. 238.

case was much shaken by the observations of Lord *Kenyon,* in *Burnet* v. *Kensington.* The case of *Dyson* v. *Rowcroft* is perfectly analogous to the present, and the reasoning of Lord *Alvanley* shows, most clearly, the incorrectness of the *dictum* of Lord *Mansfield,* in *Cocking* v. *Fraser;* and though this court, in *Le Roy* v. *Gouverneur, M'Grath* v. *Church,* and *Neilson* v. *The Columbian Insurance Company,*[\*] decided according to that case, yet in *Judah* v. *Randall,*[†] where the policy was " free of average," &c., on a chariot, on deck, and the box of the carriage was thrown overboard, the court decided, that as more than half the value of the thing was lost by the *jettison,* there was a total loss, for which the insurer was liable. This case is not reconcilable with the other decisions; and if the case of *Dyson* v. *Rowcroft* is now to be considered as the law, it completely overrules that of *Cocking* v. *Fraser. Marshall,* in his treatise,[‡] does not, in the least degree, question the correctness of the decision in *Dyson* v. *Rowcroft,* but lays down the doctrine of that case, as if it was settled law, that " if by the perils of the sea, any of the enumerated articles be so damaged as to be of no value, though they remain in specie, this will be total loss, against which the memorandum will not protect the underwriters."(a)

2. If the plaintiffs are entitled to recover, (on an average loss only,) then we say, that on the principle laid down in the case of *M'Grath & Higgins* v. *Church,* they must recover for the whole damage, as it arose in consequence of what was done for the general safety.

3. At any rate, the plaintiffs must recover the value of the goods thrown overboard.

(a) *Park,* in the *sixth* and much improved edition of his excellent work on insurance, (p. 151–155,) explains and defends the decision of Lord *Mansfield,* in *Cocking* v. *Fraser,* in the most satisfactory manner; and shows, that when the facts of the two cases are fully understood, it is not in hostility to the case of *Dyson* v. *Rowcroft.* In the latter case, *the ship was so much damaged as to be unable to proceed on her voyage, and was necessarily sold;* and in *Burnet* v *Kensington,* there was a *stranding,* neither of which facts existed in the case of *Cocking* v *Fraser.* The doctrine of Lord *Mansfield,* in the case of *Cocking* v. *Fraser,* is thus stated by Mr. *Park:* " If the commodity (being one of the enumerated cargoes) specifically remain, though it may be so damaged as to render it, on that account, the subject of total loss, if it had not been included in the memorandums, the underwriter is discharged, because there has neither been a stranding, nor has the voyage of the ship been put an end to *by any of the perils mentioned in the policy,* but because the assured did not choose, on account of the state of the cargo, to proceed to the port of destination." Though the *observations* of Lord *Alvanley* appear irreconcilable with the opinion of Lord *Mansfield,* it is reasonable to infer that the fact of the voyage having been defeated by one of the perils insured against entered into the consideration of the court of C. B., in deciding that there was a total loss; and *Chambre* J. says, " The cargo being necessarily thrown overboard, and *the ship being unable to proceed, this made a complete end of the voyage."*

ALBANY,
January. 1817.

SALTUS
v.
OCEAN INS. Co.

As to the policy on *freight*, which is valued, the plaintiffs claim a total loss, on the ground, that the subject was so deteriorated by the perils of the sea, that if carried to the place of its destination, it would not be worth the freight.

* 3 *Johns. Rep.*
321.

*Griffin*, contra. 1. As to. the claim on the *freight* policy, the case of *Griswold* v. *The New-York Insurance Company*,* is conclusive. The vessel was repaired in season, and capable of proceeding on her voyage, and earning freight. The insurers undertake merely, that the vessel shall be in a condition to earn freight.

2. As to the policy on the cargo; we say, that as the subject of the insurance *specifically* remained, the insurers are not liable, there not being a total loss within the memorandum. This point has been solemnly and definitively settled by this court, in the cases which have already been cited, of *Le Roy* v. *Gouverneur*, *M'Grath & Higgins* v. *Church*, and *Neilson* v. *Columbian Insurance Company*. The case of *Dyson* v. *Rowcroft* may be distinguished from that of *Cocking* v. *Fraser;* but even if there was any collision between them, the latter has been adopted as the law here. The decision of the court of K. B. in the late case

† 16 *East*, 214.

of *Thompson* v. *The Royal Exchange Insurance Company*,† contains the same doctrine, and confirms the authority of the case of *Cocking* v. *Fraser*.

[THOMPSON, Ch. J. It is important, that when questions of commercial law are once solemnly settled, that they should, where no principle has been violated, remain undisturbed. Even if Lord *Alvanley* doubted, or overruled the doctrine of Lord *Mansfield*, we should not think it proper, after the point had been so solemnly and deliberately settled by this court, to change the law, to suit the varying opinions of judges in *England*.]

Here is no loss of voyage, independent of the deterioration of the cargo.

3. As to the average loss: we do not deny that the plaintiffs are entitled to recover, but insist that it can be only for their proportion of the goods thrown overboard, or the *jettison*. For the plaintiffs being owners of vessel, cargo, and freight, they can recover only the portion which the defendants would be bound to contribute to the *jettison*.

The plaintiffs, if they claim more, must show, clearly and conclusively, that all the damage which happened resulted from the *jettison.*\* This, we contend, has not been done. (Here he entered into a particular examination of the evidence.)

ALBANY,
January, 1817.

SALTUS
v.
OCEAN INS. Co.
\* *Parkin* v *Tun-
no,* 2 *Campb.
Rep.* 59.

*Wells*, on the same side, was stopped by the court.

*S. Jones*, jun., in reply. In *Saltus* v. *The Ocean Insurance Company*,† the court consider the state of the cargo as affording a reason for not hiring another vessel to proceed with it to its port of destination. " Admitting," says Mr. Justice *Yates*, " that it would be the captain's duty, with an ordinary cargo, to procure a vessel at *Cork*, to send it on, no such obligation could possibly exist in this case, as the situation of the cargo rendered a re-shipment improper." So, in *Dyson* v. *Rowcroft*, the dangerous state of the cargo, rendered it necessary to throw it overboard, and the voyage was, therefore, defeated.

As to the general average : every loss or damage that may fairly be regarded as a consequence of the jettison, or the acts done for the safety of all, ought to be deemed general average.

† 12 *Johns. Rep.*
107—112.

YATES, J., delivered the opinion of the court. There can be no claim for a total or partial loss on the policy on the *freight*, as the vessel was repaired in season, so as to be in a capacity to earn freight. She arrived at *Newport*, on the 19th of *May*, and a survey was made the same day, in consequence of which she was unladen, and immediate measures taken to repair her, so that by the middle of *July* she was, (as stated in the case,) in a good condition ; and on the 28th of the same month she was in a situation to proceed to sea. Being thus seasonably ready to prosecute the voyage, if the owners had been disposed to do so, the insurers on the freight policy were completely exonerated.

In *Griswold* v. *The New-York Ins. Company*, (3 *Johns. Rep.* 328.,) this court says, if the owners had consented, the plaintiff would have been bound to proceed and run the risk (against which risk the defendant had insured by the policy) of losing the freight, by the loss of the cargo, in the course of the voyage, or of earning freight, by its safe arrival or delivery at the port of destination, without regard to the state or condition of the

cargo at the end of the voyage.   This is conclusive on this point.

The decision in the case of *Saltus* v.  *The Ocean Ins. Company,* (12 *Johns. Rep.* 107.,) appears to be, in some measure, relied on by the plaintiff's counsel, but it does not militate against the principles which must govern the decision of this cause.   On an examination of the report of that case, it will be found that the situation of the vessel, and the consequent duty of the master, was the important inquiry.   The question was, whether the master was bound to find another vessel, to carry the goods to the place of destination, elsewhere, out of the port of distress, or out of a port immediately contiguous ; and it was held that the captain was not obliged to travel sixteen miles, the distance between *Kinsale* and *Cork,* to procure another vessel. The counsel for the plaintiff attached too much importance to the remark made as to the situation of the cargo, and its re-shipment.   It was mentioned, merely incidentally, as questionable, whether, in consequence of the peculiar situation of the *hemp,* the master, who acted in good faith, admitting that it would have been his duty, with an ordinary cargo, to procure a vessel at *Cork,* would not have been justified in not procuring one. The observation was not necessary, and might have been omitted; but it affords no ground to infer that the court meant to decide that a damaged cargo, at any time, would authorize an abandonment of the voyage, so as to entitle a recovery on the *freight* policy, where an opportunity to earn the freight had existed, or on the *cargo* policy, notwithstanding the *memorandum.* On the contrary, the principle cannot now be questioned, that the fidelity and vigilance of the captain, in the course of the voyage, without regard to the diminution in value of the cargo, where the articles specifically remain, is the correct test as to the claim of freight on a policy like the present.   In this case, the vessel was ready for sea, and the freight might have been earned ; but it has not been done.   This must be deemed a sufficient protection to the defendants, as underwriters, who cannot be made liable for the freight, because the deteriorated state of the cargo rendered a sale necessary.

No claim can be sustained for a total or a partial loss on the *cargo* policy.   It consisted of perishable articles included in the *memorandum,* and it was not lost, excepting the articles thrown overboard to lighten the ship.   The defendants, there-

fore, are only liable to pay their portion in contribution towards the value of the articles which constitute the *jettison*, a principle repeatedly recognized by this court. (1 *Johns. Cas.* 226. 1 *Caines'* 196.  3 *Caines'* 108.)

The plaintiffs, however, seek to recover for a total loss, on the ground that the corn was deteriorated to more than a moiety of its value, but the rules applicable to a technical total loss, do not apply to this cargo.  It consisted of articles within the *memorandum*, by which the underwriters are exempted from all average loss, unless general, so that if there was a technical total loss of the cargo, the defendants would be protected by the memorandum.  What shall be deemed a total loss within the meaning of the policy is the important inquiry.  On this subject the courts of K. B. and C. P., in *England*, are somewhat at variance.  In *Cocking* v. *Fraser*, (*Marsh.* 227.,) Lord *Mansfield* held, that there was no total loss of those articles as long as they specifically remained, but that there must be an absolute destruction of them to make the underwriters liable.  In *Dyson* v. *Rowcroft*, (3 *Bos. & Pul.* 474.) the court of C. P. held, that where the cargo was so deteriorated as to be worth nothing, there was a total loss, although it specifically remained.  We have adopted the doctrine of the King's Bench.  In *Le Roy* v. *Gouverneur*, (1 *Johns. Cas.* 226.,) it was held, that there must be an actual total loss, as distinguished from a technical total loss, in order to make the underwriter answerable.  In *Magrath and Higgins* v. *Church*, (1 *Caines'* 212.,) the above decision is sanctioned and enforced; and it is there said that the memorandum prevents the loss from being total, unless the article has been burnt, sunk, captured, or otherwise completely destroyed.  This case also shows that a total loss, by reason of the loss of voyage, does not apply to a case where the cargo consists of articles within the memorandum.  In *Cocking* v. *Fraser* it is said, that in common cases where the voyage is obstructed, and not worth pursuing, it is a total loss, but the memorandum goes on the idea that the insurer is not to be liable for any damages, however great, while the subject exists.  In *Neilson* v. *The Columbian Ins. Company*, (3 *Caines'* 108.,) it is said, that so long as the corn physically exists, there could not be a total loss; and, though good for nothing, the underwriter was not liable, but protected by the clause in the memorandum.  From these cases, it is evident that the plaintiff can-

ALBANY,
January, 1817.

not recover on the ground of a total loss, in consequence of the deteriorated state of the cargo, or the loss of the voyage; unless, then, the injury is the necessary consequence of the *jettison*, the extent of the recovery cannot exceed the amount of the contribution towards it.

It appears, that on the 30th of *April* serious apprehension was entertained with regard to the situation of the cargo; for between that period and the 4th of *May*, the ship, by the violence of the gale and sea, was knocked down upon her beams, and the leak in the stern was discovered, the masts were cut away, and the rudder carried off. All this took place before the articles were thrown overboard. There are no reasonable grounds to suppose, that the injury to the cargo was the necessary consequence of the *jettison*. The defendants, therefore, can be made liable for no more than their contribution or proportion towards the *jettison*, for which amount, on being ascertained according to the stipulation in the case, the plaintiff is entitled to judgment.

*Judgment for the plaintiff accordingly.*

